# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **COOSA RIVERKEEPER, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No.: 2:16-cv-01737-JEO** |
| | ) |
| **OXFORD WATER WORKS AND** | ) |
| **SEWER BOARD,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION

In this action, plaintiff Coosa Riverkeeper, Inc. ("Riverkeeper") alleges

defendant Oxford Water Works and Seward Board ("Oxford") is in violation of the

Clean Water Act ("CWA") on account of illegal discharges from the Oxford Tull

C. Allen Wastewater Treatment Plant ("the Oxford Plant") into the Choccolocco

Creek. (Doc. 1 ("Complaint")).  *See* 33 U.S.C. §§ 1251-1376.  Oxford has moved

to dismiss the complaint for lack of jurisdiction and for failure to state a claim.  *See*

FED. R. CIV. P. 12(b)(1) and (12)(b)(6).  (Docs. 6 & 7).  Riverkeeper has moved to

strike one of Oxford's arguments in its reply brief.  (Doc. 22).  Riverkeeper has

also moved to file an amended complaint (doc. 26) and Oxford has moved for a

protective order (doc. 18).  Upon consideration, the court finds the motion to

dismiss is due to be granted in part and denied in part, the motion to strike is due to

be denied, the motion amend the complaint is due to be granted, and the motion for

a protective order is moot.

# I. BACKGROUND

Congress enacted the Clean Water Act ("CWA") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The CWA "establishe[s] a National Pollution Discharge Elimination System ["NPDES"] . . . that is designed to prevent harmful discharges into the Nation's waters." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007). "Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004). The NPDES permit "defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations under the [Act]." *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976). "The Environmental Protection Agency ('EPA') initially administers the NPDES permitting system for each State, but a State may apply for a transfer of permitting authority to state officials. If authority is transferred, then state officials . . . have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight." *Nat'l Ass'n of Home Builders*, 551 U.S. at 650 (citations omitted). The State of

Alabama is authorized to administer the NPDES permit system in Alabama and does so through the Alabama Department of Environmental Management ("ADEM").

A citizen may bring a civil suit to enforce the provisions of the CWA. 33 U.S.C. § 1365, *et seq*. The Act provides for a 60-day notice period prior to the institution of a citizen suit to give the violator an opportunity to bring itself into compliance with the CWA. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*., 528 U.S. 167, 174-75 (2000) ("... [C]itizens lack statutory standing under § 505(a) to sue for violations that have ceased by the time the complaint is filed."). The CWA "also bars a citizen from suing if the [Environmental Protection Agency] or State has already commenced, and is 'diligently prosecuting,' an enforcement action." *Id.* (quoting 33 U.S.C. § 1365(b)(1)(B)).

Riverkeeper alleges in this action that the Oxford Plant has continuously violated the CWA since 1992. It further asserts that the plant has been subject to multiple violation notices, enforcement actions, and administrative orders. (Complaint at ¶ 1). Despite this history, Riverkeeper alleges, the Oxford Plant continues to violate its NPDES permit. (*Id*. at ¶ 2). Riverkeeper states that it "repeatedly warned ... ADEM of the high levels of *E. coli*[1] and chlorine coming

---

[1]The full term is Escherichia coli. (*See* Doc. 26 at 1).

from the plant's discharge pipe into the Choccolocco Creek." (Doc. 13 at 4 (footnote omitted)).

Riverkeeper sent a 60-day notice to the Oxford Plant, Oxford officials, and State authorities on August 3, 2016, informing them of Riverkeeper's intention to file a citizen's suit to address the multitude of violations at the plant, including unpermitted *E. coli*, chlorine, and formaldehyde discharges. (Complaint at ¶ 3 and Ex. 1 (Doc. 1 at 24-49)). The State of Alabama brought a civil enforcement action in state court against Oxford on September 30, 2016. (*Id*. at Ex. 2 & Attachment A (Doc. 1 at 50-70)).

Riverkeeper filed the present suit on October 24, 2016, alleging in three counts that Oxford has violated the CWA. Specifically, Riverkeeper alleges (1) Oxford discharged *E. coli* and chlorine in violation of its permit discharge limitations; (2) Oxford failed to properly report its daily violations of its permit; and (3) the Oxford plant is discharging formaldehyde without a permit. (Complaint at 15-20). The claims all concern Oxford's NPDES Permit No. AL0058408 that was issued to the Oxford Waterworks and Sewer Board in 1989. It was reissued by ADEM on August 28, 2013, and expires on August 31, 2018. (Complaint at ¶ 34). Riverkeeper's claims concern wastewater releases from Outfall 0011, a discharge pipe to Choccolocco Creek, which is authorized under

Oxford's NPDES permit. (*Id*. at ¶ 32). Riverkeeper seeks (1) a declaration by this court that Oxford violated the CWA; (2) injunctive relief, compliance verification, outside sampling, modification of the NPDES permit to require sampling, and limits on formaldehyde; (3) an order ensuring enforcement of pretreatment standards for formaldehyde; (4) civil penalties; and (5) attorney's fees. (*Id*. at 20-21).

Riverkeeper filed a motion to intervene in the state court action on October 3, 2016. (Doc. 7-1 at 2). That motion has been granted. (*See* Court Exh. 1 at doc. 35).[2] The "Complaint in Intervention" includes the following claims: (1) self-reported discharge violations (Count I); (2) monitoring violations (Count II); (3) unpermitted discharges (Count III); (4) reporting violations (Count IV); (5) improper sampling procedures (Count V); and (6) maintenance and operation of the plant violations (Count VI). (*Id*. at 8-28).

Oxford has moved to dismiss this case premised on three grounds. First, because the State of Alabama is "diligently prosecuting" a state court action for violations of its NDPES permit, Oxford argues this lawsuit is barred under 33 U.S.C. § 1365(b)(1)(B).[3] (Doc. 7 at 2). Second, Oxford argues this court lacks

---

[2]Intervention is a matter of right under 33 U.S.C. § 1365(b)(1)(B).

[3] Section 1365(b)(1)(B) provides:

   (b) Notice

jurisdiction over the case because Riverkeeper's formaldehyde claim concerns past discharges and Riverkeeper cannot show that such discharges are likely to recur in the future.  (*Id*.)  Third, Oxford argues that Riverkeeper's formaldehyde claims are barred as a matter of law by the "long-standing 'permit shield'" defense.  (*Id*.)  The court conducted a hearing on the motion to dismiss, and the parties have submitted post-hearing briefs.  (Docs. 31 & 33).

## II.  MOTION TO DISMISS STANDARD

The standard of review on a motion to dismiss is typically straight-forward. This case is an exception.  Because certain of Oxford's challenges in the motion concern to subject-matter jurisdiction and are presented under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the standard of review may vary.

> When presented with a facial attack on the complaint, the court determines whether the complaint has sufficiently alleged subject-matter jurisdiction.  *Sinaltrainal* [*v. Coca-Cola Co.*], 578 F.3d [1252,] 1260 [(11th Cir. 2009)].  The court proceeds as if it were evaluating a Rule 12(b)(6) motion; that is, it views the complaint in

---

No action may be commenced—

> (1) under subsection (a)(1) of this section—

> > (B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

33 U.S.C. § 1365(b)(1)(B).

the light most favorable to the plaintiff and accepts all well-pled facts alleged in the complaint as true. *Id.*

On the other hand, a factual attack questions "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). When a court is confronted with a factual attack, the standard of review is considerably different:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—it's very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*Lawrence*, 919 F.2d at 1529 (citing *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S. Ct. 396, 70 L. Ed. 2d 212 (1981)).

*Black Warrior Riverkeeper, Inc. v. Shannon, LLC*, 2:13–CV–00763–RDP, 2014 WL 1246473, *3 (N.D. Ala. Mar. 24, 2014) (J. Proctor).

Oxford initially moves to dismiss Riverkeeper's claims for lack of subject-matter jurisdiction premised on the allegation that ADEM is currently "diligently prosecuting" an enforcement action concerning Riverkeeper's claims. The first question is whether the "diligent prosecution" bar in the CWA (33 U.S.C. §

1365(b)(1)(B)) is a jurisdictional mandate. If it is jurisdictional, the review standards of FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) are applicable. If it is not jurisdictional, this aspect of the motion is to be reviewed pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6). *La. Envtl. Action Network v. City of Baton Rouge*, 677 F.3d 737, 745 (5th Cir. 2012).

To the extent that Oxford challenges the court's subject-matter jurisdiction over the formaldehyde claims because they are "wholly past" and because of the applicability of the "permit shield defense" (*id*. at 18-21), the foregoing standards apply.

### A.      Diligent Prosecution under § 1365(b)(1)(B)

Whether the diligent prosecution bar is jurisdictional has not been decided by the Eleventh Circuit Court of Appeals. The Fifth Circuit Court of Appeals has extensively considered the matter and concluded that the bar is not jurisdictional. *La. Envtl. Action Network*, 677 F.3d at 749. After wading through significant Supreme Court precedent, the Fifth Circuit determined the bar is not jurisdictional because "Congress has not clearly mandated that the CWA's 'diligent prosecution' provision is jurisdictional." *Id*. at 747. The court stated:

> The language of § 1365(b)(1)(B) does not "clearly state[ ]" that the "diligent prosecution" bar is jurisdictional. *Arbaugh* [*v. Y&H Corp*.], 546 U.S. [500,] 515, 126 S. Ct. 1235 [(2006)]. This provision "does not speak in jurisdictional terms or refer in any way to the jurisdiction

8

of the district courts." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 394, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982). Although it is true that § 1365(b)(1)(B) is phrased in mandatory language, the Supreme Court has "rejected the notion that 'all mandatory prescriptions, however emphatic, are ... properly typed jurisdictional.'" *Henderson* [*v. Shinseki*], [562 U.S. 428, 439,] 131 S. Ct. at 1205 [(2011)] (alteration in original) (citation omitted). Thus, the language of § 1365(b)(1)(B) does not provide a clear indication that Congress intended the provision to be jurisdictional.

The placement of the "diligent prosecution" provision within the CWA also does not indicate that Congress "wanted [the] provision to be treated as having jurisdictional attributes." *Id.* at 1205. Congress placed § 1365(b)(1)(B) in the "Notice" section of the CWA citizen suit provision. *See id.* ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.") (alteration in original) (citation and internal quotation marks omitted). The "Notice" section also includes the requirement that a citizen provide notice of the alleged violation to the alleged violator, the State, and the EPA sixty-days prior to filing a citizen suit. *See* 33 U.S.C. § 1365(b)(1)(A). The sixty-day notice provision is a typical "claim-processing rule." *See Henderson,* 131 S. Ct. at 1203; *Zipes* [*v. Trans World Airlines, Inc.*], 455 U.S. [385,] 398, 102 S. Ct. 1127 [(1982)] (holding that Title VII's requirement that claimants timely file a discrimination charge with the EEOC before filing an action in federal court is nonjurisdictional). The placement of the "diligent prosecution" bar in the "Notice" section, alongside a typical claim-processing rule, suggests that Congress intended the "diligent prosecution" bar to be a claim-processing rule. *See Henderson,* 131 S. Ct. at 1205 (finding that the placement of a provision in a subchapter entitled "Procedure" indicated that "Congress regarded the 120-day limit as a claim-processing rule").

Furthermore, the "diligent prosecution" provision is "located in a provision 'separate' from those granting federal courts subject-matter jurisdiction over ... [the] claims." *Reed Elsevier, Inc.* [*v. Muchnick*], [559 U.S. 154,] 130 S. Ct. at 1245-46 [(2010)] (citation omitted). The district courts have subject matter jurisdiction over CWA citizen suits

pursuant to the general federal question jurisdiction statute, 28 U.S.C. § 1331,[ ] and the CWA's jurisdictional provision, 33 U.S.C. § 1365(a).[ ]  Neither of these provisions specifies any threshold requirement for subject matter jurisdiction, let alone ties its jurisdictional grant to the issue of diligent prosecution.  *See Arbaugh,* 546 U.S. at 515, 126 S. Ct. 1235 ("But neither § 1331, nor Title VII's jurisdictional provision, 42 U.S.C. § 2000e-5(f)(3) ... specifies any threshold ingredient akin to 28 U.S.C. § 1332's monetary floor."); *see also Reed Elsevier, Inc.,* 130 S. Ct. at 1246 ("[N]either § 1331, ... nor § 1338(a), which is specific to copyright claims, conditions its jurisdictional grant on whether copyright holders have registered their works before suing for infringement.").  Instead, the "diligent prosecution" bar is located in a separate provision of the CWA that does not pertain or refer to jurisdiction.  *See Arbaugh,* 546 U.S. at 515-16, 126 S. Ct. 1235 (holding that Title VII's employee-numerosity requirement is nonjurisdictional because it is located in a provision separate from those granting courts subject matter jurisdiction and the provision does not speak in jurisdictional terms); *see also Reed Elsevier, Inc.,* 130 S. Ct. at 1245-46 (holding that the Copyright Act's registration requirement is not jurisdictional primarily because it is located in a provision separate from those granting the courts subject matter jurisdiction and the provision does not "clearly state[ ]" that the requirement is jurisdictional).  Thus, § 1365(b)(1)(B)'s location in a provision separate from the jurisdiction-granting provisions indicates that Congress did not intend the provision to be jurisdictional.

The "historical treatment" factor also does not indicate that the provision ranks as jurisdictional.  *Reed Elsevier, Inc.,* 130 S. Ct. at 1246.  No Supreme Court cases have determined that the "diligent prosecution" provision of the CWA, or any similar provision in other environmental statutes, is jurisdictional.  "There is thus no 'long line of [Supreme] Court [ ] decisions left undisturbed by Congress' on which to rely."  *Gonzalez,* 132 S. Ct. at 648 n. 3 (citation omitted); *see Henderson,* 131 S. Ct. at 1203 ("When a long line of [Supreme] Court[ ] decisions left undisturbed by Congress has treated a similar requirement as jurisdictional, we will presume that Congress intended to follow that course.") (citations and internal quotation marks

omitted).

> Based on the foregoing analysis, we conclude that Congress has not provided a clear statement that the "diligent prosecution" bar is jurisdictional.  Absent such a clear statement from Congress, we hold that the "diligent prosecution" bar is a nonjurisdictional limitation on citizen suits.  *See Arbaugh,* 546 U.S. at 516, 126 S. Ct. 1235 ("[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.").

*Id*. at 748-49 (footnotes omitted).  The Fifth Circuit also found support for its

decision in

> the Seventh Circuit's recent decision in *Adkins v. VIM Recycling, Inc.,* 644 F.3d 483 (7th Cir. 2011).  There, the court held that the "diligent prosecution" provision of the Resource Conservation and Recovery Act ("RCRA")–which is virtually identical to the "diligent prosecution" provision of the CWA[ ]–is not jurisdictional.  *Id.* at 492. Applying the guiding principles of the recent Supreme Court cases, the Seventh Circuit concluded that, because "RCRA's limits on citizen suits appear in separate provisions that do not 'speak in jurisdictional terms,' " the RCRA "diligent prosecution" bar is a nonjurisdictional claim-processing rule.  *Id.* (citations omitted).

*Id.* at 749 (footnote omitted).

This court finds the reasoning of the Fifth Circuit in *La. Envtl. Action

Network* to be persuasive.  *See also Black Warrior Riverkeeper, Inc. v.

Southeastern Cheese Corp*., 2017 WL 359194 (S.D. Ala. Jan. 24, 2017) (J.

DuBose) (following the reasoning of *La. Envtl. Action Network* and similar cases).

Accordingly, this court concludes that because the language of § 1365(b)(1)(B)

does not provide clear indication that Congress intended the provision to be jurisdictional, it will evaluate Oxford's "diligent prosecution" defense under Rule 12(b)(6).[4]

## B.    Rule 12(b)(6)

On a motion to dismiss premised on a failure to state a claim under Rule 12(b)(6), the court assumes the factual allegations in the complaint are true and gives the plaintiff the benefit of all reasonable factual inferences. *Hazewood v. Foundation Financial Group, LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008) (per curiam). Rule 12(b)(6) is read in light of FEDERAL RULE OF CIVIL PROCEDURE 8(a)(2), which requires that a complaint provide only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the

---

[4] The court notes that in *Friends of Milwaukee's Rivers & All for Great Lakes v. Milwaukee Metro. Sewerage Dist.*, 556 F.3d 603 (7th Cir. 2009) and *Friends of Milwaukee's Rivers & All for Great Lakes v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743 (7th Cir. 2004), the court stated that 1365(b)(1)(B) is jurisdictional. Similarly, in *Chesapeake Bay Fund. v. Am. Recovery Co.*, 769 F.2d 207 (4th Cir. 1985), the court noted that the statutory bar in § 1365(b)(1)(B) "is an exception to the jurisdiction granted in subsection (a) of 1365, and jurisdiction is normally determined as of the time of the filing of a complaint." *Id.* at 208. *See also Run Pres. Ass'n v. Cty. Comm'rs*, 523 F.3d 459-61 (4th Cir. 2008) (affirming a district court's evaluation of the diligent prosecution bar under Rule 12(b)(1)). In *Student Pub. Interest Research Grp. of New Jersey, Inc. v. Fritzche, Dodge & Olcott, Inc.*, 759 F.2d 1131 (3d Cir. 1985), the Third Circuit, in discussing whether an EPA enforcement action constitutes a court proceeding, stated "a court does not have jurisdiction to entertain a private suit brought to enforce the provisions of the Clean Water Act, if (1) an agency has already commenced a "court" proceeding; and (2) such a proceeding is being 'diligently prosecuted.'" Finally, the Ninth Circuit in *Knee Deep Cattle Co., Inc. v. Bindana Inv. Co. Ltd.*, 94 F.3d 514 (9th Cir. 1996), also noted the jurisdictional nature of the diligent prosecution bar. *Id.* at 516. However, the references in each of these cases was in passing and none of the cases addressed the jurisdictional issue in a manner comparable to the depth afforded it by the Fifth Circuit. This court, therefore, does not find them to be persuasive.

defendant fair notice of what the… claim is and the grounds upon which it rests."
*See Conley v. Gibson*, 355 U.S. 41, 47 (1957).  However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusion....  Factual allegations must be enough to raise a right to relief above the speculative level...." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)*.*  Thus, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" that is, its "factual content… allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

## III.  ANALYSIS OF THE MERITS

### A.    Diligent Prosecution

Oxford argues that Riverkeeper's claims are barred by the State of Alabama's diligent prosecution of it (Oxford) in state court.  *See* 33 U.S.C. § 1365(b)(1)(B).  As noted above, section 1365(b) provides, in relevant part, that "(b) no [citizen suit under § 1365(a)(1)] may be commenced …. (B) if [a state or federal authority] has commenced and is diligently prosecuting a civil or criminal action in a court … *to require compliance with the standard, limitation, or order*." *Id.* (emphasis added).  While not jurisdictional, the diligent prosecution bar is a

"mandatory, not optional, condition precedent for suit." *Hallstrom v. Tillamook*

*Cnty.*, 493 U.S. 20, 26 (1989).

> The plaintiff in a citizens suit bears the burden of proving the state
> agency's prosecution was not diligent. *Friends of the Earth, Inc. v.
> Laidlaw Envtl. Serv. (TOC),* 890 F. Supp. 470, 486-87 (D.S.C. 1995).
> The burden is heavy, because the enforcement agency's diligence is
> presumed. *Id.* at 487. "[T]he state [enforcement] agency must be
> given great deference to proceed in a manner it considers in the best
> interests of all parties involved." *Arkansas Wildlife v. ICI Americas,
> Inc.,* 842 F. Supp. 1140, 1147 (E.D. Ark. 1993), *aff'd*, 29 F.3d 376
> (8th Cir. 1994), *cert. denied*, 513 U.S. 1147, 115 S. Ct. 1094, 130 L.
> Ed. 2d 1062 (1995). The CWA's thrust is to "provide *society* with a
> remedy against polluters in the interest of protecting the
> environment." *Connecticut Coastal* [*Fisherman's Ass'n v. Remington
> Arms Co*., *Inc*.], 777 F. Supp. [173,] 184 [(D. Conn. 1991)] (emphasis
> in original).

*Williams Pipe Line Co. v. Bayer Corp*., 964 F. Supp. 1300, 1324 (S.D. Iowa 1997);

*see also Karr v. Hefner*, 475 F.3d 1192, 1198 (10th Cir. 2007) (stating that

"[c]itizen-plaintiffs must meet a high standard to demonstrate that it has failed to

prosecute a violation diligently").

A two-prong test exists to determine whether a state agency is "diligently

prosecuting" an action. *Ohio Valley Envrtl. Coal., Inc. v. Maple Coal Co.,* 808 F.

Supp. 2d 868, 883 (S.D.W. Va. 2011); *Conn. Fund for Env't v. Contract Plating

Co.*, 631 F. Supp. 1291, 1293 (D. Conn. 1986). First, the court must determine

whether the agency aims to ensure compliance with the same standard, order, or

limitation as the citizen suit. Citizens suits are barred only if they aim to ensure

compliance with the same standard, limitation, or order of the CWA for which the State has brought a civil enforcement action. *Conn. Fund for Env't*, 631 F. Supp. at 1293; *Cal. Sportfishing Protection Alliance v. Chico Scrap Metal, Inc.*, 728 F.3d 868, 874 (9th Cir. 2013); *see also Frillage v. Village of Anna*, 924 F. Supp. 821 (S.D. Ohio 1996) (noting that the State must aim to require compliance with the same standards regarding each claim of the plaintiff); *but see Karr*, 475 F.3d 1192 (holding that the EPA had addressed each of the three types of alleged CWA violations and in some respects accomplished more than the plaintiffs sought). It is insufficient that a State seeks to require compliance with a similar State or Federal statute; the issue is whether the state action "is capable of requiring compliance with the [CWA] and is in good faith calculated to do so." *See Cal. Sportfishing*, 728 F.3d at 875. Additionally, the diligent prosecution bar does not apply "if the agency suit and citizen suit seek to enforce different standards and limitations of the same NPDES permit." *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 440 (M.D.N.C. 2015). The court also stated:

> The comparison need not reveal identical claims for the actions to cover the same standards and limitations. Citizen suits seeking to enforce the same standards and limitations as an agency suit have been barred even when they alleged violations occurring at more locations and at different times than those alleged in the agency suit.

*Id*. In making that decision, "the court may rely primarily on a comparison of the

pleadings filed in the two actions." *Id*. (quoting *Conn. Fund*, 631 F. Supp. at 1293).

Second, if the answer to the first prong is in the affirmative, the court must determine whether the prior pending action was being "diligently prosecuted" by the state at the time that the citizens' suit was filed. *Conn. Fund*, 631 F. Supp. at 1293; *Yadkin*, 141 F. Supp. 3d at 441.

> "A CWA enforcement prosecution will ordinarily be considered 'diligent' if the judicial action 'is capable of requiring compliance with the Act and is in good faith calculated to do so.' " *Piney Run,* 523 F.3d at 459 (quoting *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.,* 382 F.3d 743, 760 (7th Cir. 2004)). "[D]iligence is presumed." *Id.* To overcome this presumption, the citizen-plaintiff can demonstrate "a pattern of conduct in [the state's] prosecution of the defendant that could be considered dilatory, collusive or otherwise in bad faith." *Connecticut Fund,* 631 F. Supp. at 1293. It is insufficient to merely show "that the agency's prosecution strategy is less aggressive than [the citizen-plaintiff] would like," *Piney Run,* 523 F.3d at 459, as the diligent prosecution bar "does not require government prosecution to be far-reaching or zealous," *id.* (quoting *Karr,* 475 F.3d at 1197). The standard for citizen-plaintiffs to overcome the presumption of diligence is high. *Id.* (quoting *Karr,* 475 F.3d at 1198). The deference courts owe to the agency prosecution, however, is not unlimited. *Ohio Valley Envtl. Coal., Inc. v. Maple Coal Co.,* 808 F. Supp.2d 868, 884 (S.D.W.Va. 2011). "[A] diligent prosecution analysis requires more than mere acceptance at face value of the potentially self-serving statements of a state agency and the violator." *Id.* (alteration in original) (quoting *Friends of Milwaukee's Rivers,* 382 F.3d at 760). It requires that the agency "try, diligently," to achieve compliance. *Id.* (quoting *Friends of Milwaukee's Rivers,* 382 F.3d at 759).

*Id*., 141 F. Supp. 3d at 441.

### 1. Seeking to Enforce Same Matters

In addressing the first prong – whether the State's civil enforcement action and the citizens' suit seek to enforce the same standards, limitations, or orders – "the court may rely primarily on a comparison of the pleadings filed in the two actions."[5] *Id*. at 440 (quoting *Conn. Fund*, 631 F. Supp. at 1293). "The comparison need not reveal identical claims for the actions to cover the same standards and limitations." *Id*. "[T]he presumption of diligence is guided by Congress' intent to prevent a situation where defendants may 'be subjected simultaneously to multiple suits, and potentially to conflicting court orders, to enforce the same statutory standards.'" *Conn. Fund*, 631 F. Supp. at 1293. In *Catawba Riverkeeper Foundation v. Duke Energy Carolinas, LLC*, 2014 WL 1411787 (W.D.N.C. 2014), the court stated:

> Subsection [1365](b)'s reference to "the" clean-water standard makes it clear that it must be the same standard, limitation, or order that is the subject of the citizen suit under subsection (a). *California Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc*., 728 F.3d 868, 874 (9th Cir. 2013) (emphasis added). "[C]itizen suits are barred only if they are based on the very same standards, limitations, or orders for which the State has brought a civil enforcement action." *Frilling v. Village of Anna*, 924 F. Supp. 821, 836 (S.D. Ohio 1996) (emphasis in original).

---

[5]The *Conn. Fund* court also stated, "It was surely not the intent of Congress to 'overburden the courts' and the parties by requiring prolonged litigation over the similarities between the state's suit and the citizens' suit before the latter could be dismissed." 631 F. Supp. at 1293.

*Id.* at *1.

The CWA allows a citizen to enforce "an effluent standard or limitation under this chapter." Pursuant to 33 U.S.C. § 1365(f)(6), this includes "a permit or condition" issued under the NPDES permitting system. *See* 33 U.S.C. § 1342. Oxford asserts in its motion to dismiss that "[a] plain reading of the text of § 1365 makes clear that when a state agency is diligently prosecuting an enforcement action that seeks compliance with <u>an NPDES permit</u> it will bar a citizens' suit that also seeks compliance with <u>that NPDES permit</u>." (Doc. 14 at 16 (underline in original)). Oxford reiterates this in its post-hearing brief. (*See* Doc. 33 at 3, 13 (stating "the ultimate question ... is whether the state's action ... seeks to achieve Oxford's compliance with its NPDES permit" and stating that dismissal is in order because "ADEM seeks compliance with the same NPDES permit...")). Riverkeeper argues that the motion is due to be denied because the "claims [in this action] do not seek compliance for the same effluent standards or limitations." (Doc. 13 at 12-13 and n.5 ("the State here has not sought to enforce Plaintiff's claims at all)).

The court in *Conn. Fund* stated:

The legislative history of the Act states that the federal courts, in deciding whether the defendant in a citizens' suit is already being "diligently prosecuted" by the state,

18

> would be expected to consider the [citizens'] petition
> against the background of the agency action and could
> determine that such action would be adequate to justify
> suspension, dismissal, or consolidation of the citizen
> petition. On the other hand, if the court viewed the
> agency action as inadequate, it would have jurisdiction to
> consider the citizen action notwithstanding any pending
> agency action.

*Id*. at 1293 (citing Federal Water Pollution Control Act Amendments of 1972, S.

Rep. No. 414, 92d Cong., 1st Sess., reprinted in 1972 U.S. Code Cong. & Ad.

News 3668, 3746). The court further concluded, "It appears to have been the

intent of Congress to bar a citizens' suit whenever the same purpose could

'adequate[ly]' be achieved by a prior pending suit regardless of whether the

identical violations were asserted or the identical remedy was sought in the two

actions." *Id.*

### a. Exceeding NPDES *E. coli* and chlorine permit discharge limitations (Count I)[6]

Riverkeeper's first federal claim seeks to have this court redress Oxford's

purported failure to comply with its NPDES permit limitations regarding *E. coli*

and chlorine discharges from its Oxford plant during the period of February 23,

2016 through August 9, 2016. (Doc. 1 at 15-16 & Table 1). Riverkeeper asserts

that EPA-approved testing reveals that the plant has discharged and continues to

---

[6]*See* Doc. 1 at 15-16, ¶¶ 76-82.

discharge *E. coli* and chlorine well-above permitted levels. *Id.* Riverkeeper requests that this court require Oxford to comply with the CWA via sampling verification by an independent private engineering firm. (*Id*. at 20). Oxford responds that this suit is due to be dismissed because of ADEM's diligent prosecution of its state court action. (Doc. 7 at 6-14). Specifically as to this claim, Oxford asserts that both the federal and the state complaints allege that Oxford discharged waste water from the same outfall in violation of the effluent limitations in the same permit and "[b]oth complaints allege that Oxford has violated its permit with regard to *E. coli* and formaldehyde."[7] (*Id*. at 12). Oxford also asserts that this suit is due to be dismissed because Riverkeeper seeks to compel compliance with the same standard and limitation at issue in ADEM's enforcement action. (Doc. 14 at 14-19).

In assessing this aspect of Oxford's argument, the court believes it is helpful to first examine the state court complaint. While the complaint alleges only two counts that incorporate all the previous paragraphs of the document (*see* doc. 1 at 62-63, ¶¶ 57-60), there are in fact five distinct violations alleged by the State in the complaint: (1) unpermitted discharges of "Total Suspended Solids (TSS)…, Total Nitrogen as Ammonia (NH3-N)…, Fecal Coliform (FC)…, 5-Day Carbonaceous

---

[7]Oxford does not specifically reference chlorine in this part of its response or reply.

Biochemical Oxygen Demand (CBOD)…, CBOD Percent Removal, and TSS Percent Removal (*id.* at 54-55, ¶¶ 6-13); (2) a failure to sample or monitor *E. coli*, NH3-N, Color, and effluent CBOD (*id.* at 55-57, ¶¶ 14-27); (3) discharging without a permit (*id.* at 57-58, ¶¶ 28-30 & (Attachment A)[8]); (4) a failure to follow reporting requirements[9] (*id.* at 58-62, ¶¶ 31-53); and (5) a failure to properly operate and maintain the facility (*id.* at 62, ¶¶ 54-56).

Unlike the federal complaint, the complaint in the state court action does not allege that Oxford violated its NPDES permit with regard to *E. coli* or chlorine discharges during the period from February 23, 2016, through August 9, 2016. (*Compare* Doc. 1 at 15-16 with 54-55 & Attachment A thereto (at 65-68)). Instead, the first count in the state court complaint provides that "discharges from Outfall 0011 did not comply with the Permit limitations for Total Suspended Solids…, Total Nitrogen as Ammonia…, Fecal Coliform…, 5-Day Carbonaceous Biochemical Oxygen Demand…, CBOD Percent Removal, and TSS Percent Removal" from August 2011 until June 2015. (*Id.* at 54, ¶ 7 & Attachment A).

---

[8]Attachment A to the state court complaint lists TSS, NH3-N, FC, and CBOD. (Doc. 1 at 65-68 (Attachment A)).

[9]This claim is divided into five sub-claims: (1) failure to submit complete and accurate noncompliance notification forms; (2) failure to provide timely and appropriate notifications of sanitary sewer overflows; (3) failure to report unpermitted discharges as required by the permit; (4) failure to submit timely discharge monitoring reports; and (5) failure to report adverse impacts caused by industrial dischargers. (Doc. 1 at 58-62, ¶¶ 31-53).

The state court complaint also does not allege that Oxford discharged *E. coli* or chlorine without a permit.  (*See id*.).  While the third count of that complaint alleges that Oxford had un-permitted "sanitary sewer overflows" for various substances, the listed substances do not articulate instances involving *E. coli* or chlorine discharges.  (*Id*.)  Nowhere does the complaint allege that Oxford violated its permit discharge limitations for *E. coli* or chlorine.  Riverkeeper focuses on this point, stating that in drafting its complaint, it included "only claims omitted from the State Action..., in order to 'supplement,' rather than 'supplant' the State Action."  (Doc. 13 at 15 (footnote omitted)).

The state court complaint does assert that Oxford failed to monitor *E. coli* and other constituent substance discharges from Outfall 0011.  (*See id*. at 55, ¶¶ 14-15 & at 68-69 (Attachment A at pages 4-5 of 6)).  Specifically, it asserts that Oxford failed monitor for *E. coli* three time per week in March 2013 and from February 2014 through March 2016[10] as it was required to do.  (*Id*.)

The question before this court is whether the state court action encompasses Riverkeeper's federal court claim so as to preclude its challenge to Oxford's purported unpermitted *E. coli* and chlorine discharges asserted in Count I. Accordingly, the court will examine whether ADEM's current state-court action

---

[10]No violation was alleged for March and April 2015.  (*Id*. at 69).

"is 'capable of requiring compliance' with the [CWA] and is 'calculated to do so' "
with regard to Riverkeeper's allegations in that count. *Friends of Milwaukee's Rivers*, 382 F.3d at 759. In doing so, the inquiry must focus "on whether [ADEM's] actions are calculated to eliminate the cause(s) of the violations." *Id*. If this court finds that ADEM's state court action is inadequate, the motion to dismiss would be due to be denied as to this first count in the federal complaint. *See Conn. Fund*, 631 F. Supp. at 1293.

While it is a close question, the court is convinced that the allegations in the state court action do not sufficiently encompass Riverkeeper's Count I claims to preclude that claim in this action for a number of reasons. First, the discharges alleged in the federal complaint involve different pollutants released at different times. Second, despite being provided notice of the purported violations, the State has decided not to advance discharge claims involving *E. coli* and chlorine. Third, the court does not read the "same standard, limitation, or order" as broadly as Oxford does. Thus, the court finds that Oxford has not satisfied the first prong of the "diligently prosecute" test.

In reaching this conclusion the court recognizes that both cases involve enforcement actions concerning the same NPDES permit and violations at Oxford Plant outfall 0011. The court also recognizes that while *E. coli* is listed in the state

court action monitoring violations in March 2013 and from February 2014 through March 2016, it is only included as one of the items Oxford failed to monitor. These claims do not include allegations of discharge violations. The court also notes that chlorine violations are not mentioned anywhere in the state complaint.

Additionally, the court has considered the fact that Riverkeeper has been permitted to intervene in the state court action, which it is entitled to do as a matter of right. *See* 33 U.S.C. § 1365(b)(1)(B). Intervention, however, will only allow Riverkeeper to "bring [its] views to the attention of the court" on the claims before that court. *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 708, n.4 (2000). As just noted, however, the state court complaint does not assert unpermitted *E. coli* and chlorine discharge violations. The complaint in intervention supports only the claims being advanced in that action.[11]

In sum, this court concludes that the first claim is not barred by the state enforcement action. The court is not convinced that the state action "is capable of requiring compliance with the [CWA]" concerning purported *E. coli* and chlorine discharges during the relevant period. *Friends of Milwaukee's Rivers*, 382 F.3d at

_____

[11]Oxford points out that Riverkeeper asserts in its motion to intervene in the state court action that its intent is to ensure that "all violations are prosecuted." (*See* Doc. 7-1 at 9, ¶ 4). However, Riverkeeper's intent is not controlling concerning what the state court is likely to do.

760. The motion, therefore, is due to be denied as to this count of the complaint.[12]

### b. Violating NPDES Permit Reporting Requirements (Count II)[13]

Riverkeeper alleges in its second count in this action that Oxford has violated and continues to violate its NPDES permit by failing to comply with its reporting requirements. (Doc. 1 at 16-18). Riverkeeper specifically alleges Oxford violated its permit in two ways: (1) when it exceeded its permit limitations concerning *E. coli* and chlorine from February 2016 through August 2016 and did not report each exceedance, in violation of § 1311(a) (doc. 1 at 16-17, ¶¶ 83-90 & 16, ¶ 80 (Table 1)) and (2) when Oxford did report the foregoing exceedances, as well as other exceedances, it incorrectly listed the number of permit violations in terms of months (or weeks) instead of total number days for the violations during the foregoing time and for other substances for July, September and October 2014 and June 2015 (*id*. at 16-17, ¶¶ 83-90 & Table 2).[14]

---

[12]In so finding, this court recognizes that if it dismissed this action "there is nothing in the 'diligent prosecution' rule that would bar a future citizens' suit if the state fail[s] to bring the defendant into compliance" concerning the claims alleged herein. *Conn. Fund*, 631 F. Supp. at 1293. However, that is not the proper consideration at this juncture.

[13]*See* Doc. 1 at 16-17, ¶¶ 83-90.

[14]In *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128 (11th Cir. 1990), the Eleventh Circuit Court of Appeals "held that monthly per-day-average violations of a pollutant are to be counted as one violation for each day of the month in which the average was violated, although daily maximum violations for that same pollutant occurring in the same month would not be counted." *United States v. Gulf States Steel, Inc.*, 54 F. Supp. 2d 1233, 1248 n.20 (N.D. Ala. 1999) (citing *Tyson Foods*, 897 F.2d at 1139-40).

The CWA requires a plant administrator to disclose any violations of a NPDES permit effluent limitation. *See* 33 U.S.C. §§ 1318(a) & 1319(a). It further provides that any person who violates § 1318 "shall be subject to a civil penalty not to exceed $25,000 per day for each violation." *See* 33 U.S.C. § 1319(d).

The state enforcement action alleges that Oxford violated its reporting requirements by (1) failing to submit complete and accurate noncompliance notification forms concerning CBOD for July 2013 and September 2014 (doc. 1 at 58, ¶¶ 31-33); (2) failing to provide timely and appropriate notifications of sanitary sewer overflows for 2011-2015 (*id*. at 58-60, ¶¶ 34-41); (3) failing to report required information in its Annual Municipal Water Pollution Prevention Program Report concerning unpermitted discharges of untreated wastewater in 2011 and 2012 (*id*. at 60, ¶¶ 42-44); (4) failing to submit timely discharge monitoring reports in 2013 (*id*. at 61, ¶¶ 45-47); and (5) failing to report adverse impacts caused by industrial discharges (*viz*. impact of Kronospan discharging high amounts of formaldehyde that was affecting water treatment during the period of 2012-2015) (*id*. at 61-62, ¶¶ 48-53).

As noted in the previous section, the state enforcement action references *E. coli* sampling violations in March 2013 and from February 2014 through March 2016. (*See* Doc. 1 at 68-69). Riverkeeper's second count in the federal complaint

alleges *E. coli* and chlorine discharge and reporting violations occurring between February 23, 2016 and August 9, 2016.[15]  (Doc. 1 at 16-17, ¶¶ 83-85 & 16, ¶ 80 (Table 1)).  It also alleges that Oxford failed to "report the correct number of violations" when it did report them.  (*Id*. at 16-17, ¶¶ 83-90 & Table 2).  The relevant question for this court again is whether the state action "is 'capable of requiring compliance' with the [CWA] and is 'calculated to do so' " with regard to Riverkeeper's allegations in that count.  *Friends of Milwaukee's Rivers*, 382 F.3d at 759.

While the federal claims are distinct from the state action claims, they all involve violations of the reporting requirements of the CWA and the applicable NPDES permit.  They are not mutually exclusive.  To the contrary, the federal claims complement and support the allegations in the state action.  There is no reason to believe that the state court action is inadequate to require compliance with the relevant CWA reporting requirements, including the *E. coli* and chlorine violations alleged herein.  Thus, the court finds that the second count of this action is adequately covered by the pending state court action.

Riverkeeper states in its brief that its counsel "was advised by the State's attorney that the State did not plan to enforce the claims asserted by Riverkeeper

---

[15]This count also alleges reporting violations concerning CBOD and Ammonia.  (*Id*. at 16-17 & Table 1).

because it did not have sufficient evidence to do so." (Doc. 13 at 16). While there is no evidence of this statement in the record, even if it is correct, that does not preclude Riverkeeper's counsel from protecting its interest as an intervener in the state court action concerning these claims. To the extent that Riverkeeper also argues that "[t]he State's claims are limited to violations that have been self reported ... or were discovered during state inspections; whereas, most of the evidence substantiating Riverkeeper's claims are from Riverkeeper's own sampling as analyzed by an independent" lab, the court finds that while intervention does not necessarily afford Riverkeeper the right to independently enforce its purported violations, it is adequate to bring these violations to the attention of the state court along with the other listed violations. (*See* Doc. 7-1 at 17-22 (Complaint in Intervention (Count II)).[16] Should the state court find Oxford has committed monitoring violations, it seems reasonable to believe that court could, would, and should require monitoring compliance concerning these constituent items (*E. coli* and chlorine) as well. Even if the state court takes a narrow view of the claims that may be advanced, any remedy to ensure monitoring compliance seems likely to include these additional constituents. The court, therefore, finds that Oxford has satisfied the first prong of its motion to dismiss as

---

[16]The complaint alleges 819 monitoring violations, 245 of which involve *E. coli*.

to this claim.

### c.     Unpermitted Formaldehyde Discharges (Count III)[17]

Riverkeeper alleges in its third count in this case that Oxford has been
illegally discharging, on an ongoing basis, formaldehyde, which is a hazardous
substance not listed as a permitted discharge in Oxford's NPDES Permit. (Doc. 1
at 18-20, ¶¶ 91-99). Riverkeeper supports this claim with detailed allegations
concerning specific sampling from 2012. Additionally, Riverkeeper cites to an
April 24, 2012 ADEM inspection report stating that Plant personnel "explained ...
that Kronospan was discharging a large amount of formaldehyde into the Oxford
Plant which 'was affecting water treatment.'" (*Id*. at ¶ 94). Riverkeeper also cites
August 12, 2014 and October 27, 2015 inspection reports indicating that Plant
personnel were "still having problems with Kronospan's formaldehyde
concentration[s]" and "that their limits are too high." (*Id*. at ¶ 96). Riverkeeper
further alleges that on June 23, 2016, Kronospan announced a $362 million
expansion that "will add four production lines for creating laminate flooring panels
and a particle board production facility, and in all likelihood will increase its
discharge of formaldehyde to the Oxford Plant." (*Id*. at ¶ 97). Finally,
Riverkeeper states that on October 3, 2016, Meredith Holzer, an Engineer at the

---

[17]Doc. 1 at 18-20, ¶¶91-99.

Oxford Plant, wrote to ADEM explaining that the Plant was still having problems with Kronospan's waste. (*Id*. at 20, ¶ 98). Riverkeeper requests that this court order Oxford to "enact and enforce pretreatment standards for formaldehyde that will be protective of the water quality standards in Choccolocca Creek." (Doc. 1 at 20 (Demand for Relief)).

There are no formaldehyde claims asserted in the state court action or in the complaint in intervention. Oxford offers the general defense to this count that the federal action is precluded because the state court action is adequate "to require compliance with the standard, limitation, or order." (*See* Doc. 14 at 15 (citing 33 U.S.C. § 1365(b)(1)(B)).[18]

Section 1311(a) of the CWA prohibits the discharge of pollutants not authorized by the terms of an NPDES permit. Once again, the relevant question at this juncture is whether the state action "is 'capable of requiring compliance' with the [CWA] and is 'calculated to do so' " with regard to Riverkeeper's allegations in this count. *Friends of Milwaukee's Rivers*, 382 F.3d at 759. The undersigned believes that the state court action is not adequate to accomplish that for the reasons previously discussed herein.

---

[18] To the extent Oxford asserts other defenses with regard to the formaldehyde claims, they will be addressed below.

## 2.    State Court Proceedings

The second prong the court must consider on the motion to dismiss is whether the prior pending action is being "diligently prosecuted" by the state. *Conn. Fund*, 631 F. Supp. at 1293.  In considering this aspect of the motion, the court remains cognizant of the fact that Riverkeeper bears the burden of proving the state agency's prosecution was not diligent and that burden is heavy, because ADEM's diligence is presumed.  *Williams Pipe Line Co.*, 964 F. Supp. at 1324.

Oxford alleges that because ADEM is diligently prosecuting the state enforcement action, the federal action is due to be dismissed.  (Doc. 7 at 1). Riverkeeper responds that the court need not reach this argument because the proper disposition of the motion on the first prong moots the need for consideration of this aspect of Oxford's motion.  (Doc. 13 at 17).  Riverkeeper also argues, "Although states are presumed to be diligent in their enforcement of a claim, the State here has not sought to enforce Plaintiff's claims at all, and the absence of enforcement cannot amount to diligent enforcement."  (Doc. 13 at 13, n.5).

Because of the court's determination on the first and third claims, the undersigned pretermits discussion concerning the second prong on those claims. As to the second claim, involving purported monitoring violations, the court finds

on the present record – limited as it may be at this juncture – that ADEM is actively perusing the state court action. (*See State of Alabama v. Oxford Water Works and Sewer Board*, CV-2016-900310.00, alacourt.com and Court Exh. 1). This is particularly true in view of the recency of the filing of that action and the presumption accompanying such actions. Riverkeeper has not shown otherwise with regard to the advancement of the state court action. Additionally, as an intervener, Riverkeeper will be an active participant in that litigation as was noted and discussed above.

## B.  Other Defenses to the Formaldehyde Claim

Oxford also asserts that Count III of the complaint in this case is due to be dismissed because it involves only past violations (doc. 7 at 14-18) and because of the "permit shield defense" (*id*. at 18-21).

### 1.  Past Discharges

Oxford argues that this court lacks jurisdiction over Riverkeeper's formaldehyde claim because the claim only concerns purported past violations. (Doc. 7 at 15-17).  In *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 64 (1987), the United States Supreme Court held that a plaintiff must make a

> good-faith allegation of continuous or intermittent violation [to support its claim].  It is not necessary that plaintiffs prove their allegations of ongoing noncompliance before jurisdiction attaches, since the statute does not require that a defendant "be in violation" at

the commencement of suit, but only that the defendant be "alleged to
be in violation."

"Congress's use of the phrase 'alleged to be in violation' reflects a conscious

sensitivity to the practical difficulties of detecting and proving chronic episodic

violations of environmental standards." *Id.* at 65. However, "a complaint must

contain sufficient factual matter, accepted as true, to state a claim for relief that is

plausible on its face. A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing

*Twombly*, 550 U.S. at 570). Stated another way, the allegations must "plausibly

suggest[ ] (not merely [be] consistent with)" wrongful activity. *Twombly*, 550 U.S.

at 557. Accordingly, the question is whether Riverkeeper's allegations in the third

count meet this standard. The court believes they do.

Riverkeeper has alleged Oxford's formaldehyde discharges are "intermittent

and sporadic and will be ongoing." (Doc. 1 (Complaint) at 20, ¶ 99). Oxford

argues, however, that the only discharges Riverkeeper identifies occurred over four

years ago. (Doc. 7 at 17). Oxford further highlights "that 'Riverkeeper [has]

conducted sampling throughout the Coosa River Basin' over the past two years"

and yet no new or more recent discharges have been alleged in the federal

complaint. (*Id*. (footnote omitted)[19]). Oxford also notes that Riverkeeper's allegations lack "evidentiary support.'" (*Id*. at 15).

The present complaint alleges that the Oxford Plant has improperly discharged formaldehyde "on an ongoing basis." (Doc. 1 at 18, ¶ 93). In support of this, Riverkeeper alleges that from March 2, 2012, through July 19, 2012, samples from the Plant's effluent evidenced unpermitted formaldehyde discharges. (*Id*. at ¶ 95). Additionally, an April 24, 2012 ADEM inspection report states that Plant personnel "explained ... that Kronospan was discharging a large amount of formaldehyde into the Oxford Plant which 'was affecting water treatment.'" (*Id*. at ¶ 94). Further, August 12, 2014 and October 27, 2015 inspection reports indicate that Plant personnel were "still having problems with Kronospan's formaldehyde concentration[s]" and "that their limits are too high." (*Id*. at ¶ 96). Riverkeeper also alleges that on June 23, 2016, Kronospan announced a $362 million expansion that "will add four production lines for creating laminate flooring panels and a particle board production facility, and in all likelihood will increase its discharge of formaldehyde to the Oxford Plant." (*Id*. at ¶ 97). Finally, Riverkeeper states that on October 3, 2016, Meredith Holzer, an Engineer at the Oxford Plant, wrote to

---

[19]In the footnote, Oxford notes, among other things, that "despite Riverkeeper's stated concerns regarding formaldehyde, it either never conducted analysis for formaldehyde or, if it did, it failed to find formaldehyde in Oxford's effluent." (Doc. 7 at 17 n.16).

ADEM explaining that the Plant was still having problems with Kronospan's

waste.  (*Id*. at 20, ¶ 98).  Specifically, she explained:

> Kronospan called our operator at the WWTP at 8 am to let us know
> there was an upset with their wastewater treatment process around 5
> am .... flow with very high solids begin[ing] to hit the plant around
> 8:30 am so the flow was diverted to the Equalization Basin.  As of
> 2:30 pm, Oxford is still diverting the flow from Kronospan.

(*Id*.)

The foregoing allegations satisfy the requisite standard to overcome the

motion to dismiss.  While the last documented discharge was about four years

before the filing of the complaint, there is additional evidence that Oxford was

having issues with Kronospan's formaldehyde affluent during 2014, 2015, and as

recently as October 3, 2016 – weeks before the filing of the complaint.

Additionally, the planned expansion of Kronospan's operation supports

Riverkeeper's claim that formaldehyde is likely to remain a problem.[20]  The

motion, therefore, is due to be denied on this ground.

---

[20]In *Ohio Valley Envtl. Coalition, Inc. v. Alex Energy, Inc.*, 12 F. Supp. 3d 844, 876 (S.D.W.Va.
2014), in considering various motions for summary judgment, the court held that the plaintiff
pled an alleged violation in good faith, even though there was a two-year time lapse between the
complaint and the last recorded violation.  While there was a significant lapse in time between
the alleged discharges and the filing of the complaint, the court noted that "it d[id] not appear to
be a 'legal certainty' that [the defendant] had corrected its problems at [the site] by the time the
[c]omplaint was filed."  *Id.*

## 2. Permit Shield Defense[21]

Oxford next argues that Riverkeeper's formaldehyde claim is due to be dismissed because it is barred by the permit shield defense and "thus fail[s] to state a claim for which relief can be granted." (Doc. 7 at 2). Specifically, Oxford states that it "adequately disclosed its formaldehyde discharges to ADEM prior to ADEM's 2013 renewal of [its] NPDES permit [a]nd after being notified of those discharges, ADEM did not include any effluent limitation in that permit renewal." (*Id*. at 17-18). Riverkeeper asserts that this argument fails for two reasons: (1) Oxford did not adequately disclose its formaldehyde discharges during the permitting process and (2) the discharge of formaldehyde was not within the knowledge or contemplation of ADEM when it issued the permit. (Doc. 13 at 19-20).

Section 301(a) of the CWA prohibits the discharge of pollutants not authorized by the terms of an NPDES permit. *See* 33 U.S.C. § 1311(a).

---

[21]Riverkeeper moves to strike this portion of Oxford's reply brief to the extent it presents new factual and legal arguments that Oxford "adequately disclosed" the formaldehyde issue to ADEM. (Doc. 22). *See* FED. R. CIV. P. 12(f). In sum and substance, Riverkeeper complains that Oxford "shifted its argument [in this case] ... to focus on general information in its own permit application" for the first time. (Doc. 22 at 2). The court declines to strike the argument. While the reply brief does hone the previous argument, it is not so beyond the pale that it should be struck. To the extent that Riverkeeper requests an opportunity to file an additional response to the reply brief, that is not necessary. Riverkeeper has already noted that it believes the argument to be without merit, and it has offered cases in support of its position. (*See* Doc. 22 at 2, n.2). More importantly, as will be discussed further below, the court has rejected the merits of this argument for purposes of the motion to dismiss.

Formaldehyde is not specifically authorized for discharge under the NPDES permit

in this case. Accordingly, the issue for this court is

> whether the permit implicitly incorporates pollutant discharges
> disclosed by the permit holder to the permitting authority that are not
> explicitly allowed in the permit. Put more simply, although an
> operator may report multiple discharges of pollutants to the licensing
> body, the permit may only contain explicit limitations for some of
> those pollutants. The question, in that circumstance, is whether the
> permit holder may continue to empty the unlisted pollutants into the
> water, or whether it may only discharge those pollutants that are
> specifically listed in the permit.

*Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, *MD*, 268 F.3d 255, 266

(4th Cir. 2001). In *Piney Run*, a case involving a CWA citizen suit challenging a

county's discharge of thermal pollution from its sewage treatment plants into a

stream, the court explained the CWA permitting process and application of the

permit shield defense:

> The applicant discloses the nature of its effluent discharges to the
> permitting authority. The permitting authority analyzes the
> environmental risk posed by the discharge, and places limits on those
> pollutants that, in the words of the Second Circuit and EPA, it
> "reasonably anticipates" could damage the environmental integrity of
> the affected waterway.... Thus, as long as a permit holder complies
> with the CWA's reporting and disclosure requirements, it may
> discharge pollutants not expressly mentioned in the permit.... The
> only other limitation on the permit holder's ability to discharge such
> pollutants is that the discharges must be reasonably anticipated by, or
> within the reasonable contemplation of, the permitting authority....
> Because the permitting scheme is dependent on the permitting
> authority being able to judge whether the discharge of a particular
> pollutant constitutes a significant threat to the environment,

> discharges not within the reasonable contemplation of the permitting authority during the permit application process, whether spills or otherwise, do not come within the protection of the permit shield.

*Id*. at 268 (citations omitted).  In sum, if Oxford fully disclosed the formaldehyde discharges such that it was within the reasonable contemplation of ADEM's consideration during the application process, the defense applies provided Oxford is otherwise in compliance with its permit.[22]  *Id*. at 267-69; *see also Natural Resources Defense Council v. Metro. Water Reclamation Dist. of Greater Chicago*, 175 F. Supp. 3d 1041, 1050 (N.D. Ill. March 31, 2016) (noting that "the Fourth Circuit held that the permit shield applies whenever the polluter complies with the terms of its permit and makes full disclosure of its discharges such that the challenged discharge is within the reasonable contemplation of the permitting authority"); *In re Ketchikan Pulp Co.*, 7 E.A.D. 605, 1998 WL 284964, *11 (E.P.A. May 15, 1998) (holding that "the permit applicant's disclosures during the

---

[22]Oxford argues, in part:

> The purpose of requiring disclosure of discharges during the application process is to put the permitting authority on notice of such discharges so it may "judge whether the discharge of a particular pollutant constitutes a significant threat to the environment." ....  There is nothing magic about the application itself. Instead, the permit shield should apply to "all discharges adequately disclosed to the permitting authority," ... , regardless of whether or not the disclosure is in the permit application.

(Doc. 14 at 24 (citations omitted)).  The court finds this to be too narrow a reading of the defense.  This approach ignores the importance of the timing of the disclosure in relation to whether it would be within the reasonable contemplation of the permitting authority at the time a decision is made concerning the relevant permit.

application process…, and the permit authority's knowledge as a result of that disclosure, are critical factors in determining whether the shield defense is applicable.").

The record before the court on this issue includes the following: (1) a November 19, 2009 letter from Oxford to ADEM regarding Kronospan's draft Significant Indirect Discharge ("SID") permit, (2) Oxford's 2012 permit application, (3) the allegation in the complaint that during an April 2012 inspection that "Oxford personnel complained that Kronospan was discharging a large amount of formaldehyde and that those discharges were 'affecting water treatment'" (doc. 1 at 18, ¶ 94), and (4) the August 28, 2013 NDPES permit. The 2009 letter provides, in pertinent part:

> In response to the October 22, 2009 letter concerning the draft SID Permit for Kronospan LLC, the Oxford Water Works and Sewer Board (OWWSB) offers the following response. The only limits being set for Kronospan within this draft SID are pH limits. Based on the analytical data from their wastewater stream, we would also like to see ADEM set limits for temperature, dissolved oxygen, BOD, TSS, COD, Total Phosphorous, Ammonia, Oil and Grease, and Formaldehyde instead of just monitoring some of these specific parameters. High levels of these compounds are putting a strain on our Wastewater Treatment Facility. Specifically, the plant has had two exceedances for ammonia in the past two moths. Also, due to the carcinogenic effects, we request a BPJ limit put on formaldehyde.

(Doc. 7-2 at 2). Oxford's application for its NPDES permit renewal does not mention formaldehyde at all. (*See* Doc. 13-2 and 13-3). The 2013 NPDES permit

renewal issued by ADEM does not mention formaldehyde.  (*See* Doc. 7-3).

Oxford also contends that it listed Kronospan as one of a handful of "Significant Industrial Users" in its 2013 NPDES permit application and that the listing should have prompted ADEM to review Kronospan's SID file in conjunction with Oxford's NPDES permit application, which would have led ADEM to see Oxford's 2009 letter regarding Kronospan's draft SID Permit requesting discharge limits for formaldehyde.  (*See* Doc. 14 at 23; Doc. 13-3 at 42; and Doc. 25 at 4-5).  Furthermore, Oxford states that it "highlighted the fact [in its 2013 NPDES permit application] that it disclosed that Kronospan's 'principal product' was 'fiberboard,' identifying 'wood chips' as among the 'raw materials that affect or contribute to [Kronospan's] discharge.'"  (Doc. 25 at 4).  Oxford goes on to note that "[t]his is significant because fiberboard and wood chips have long since been a known source of formaldehyde."  (*Id*. (citing Beat Meyer & Karl Hermanns, *Formaldehyde Release from Pressed Wood Products*, in FORMALDEHYDE 101-06 (Am. Chem. Soc. 1985)).

Oxford's motion to dismiss is due to be denied as to the formaldehyde claims for a number of reasons.  First, the court is not satisfied that the foregoing "facts" are sufficient as a matter of law for this court to conclude there was adequate disclosure.  The 2009 letter, while providing some notice to ADEM

concerning formaldehyde, preceded the application process by at least three years. The allegations in the complaint that Oxford personnel complained to ADEM during an inspection in April 2012 "that Kronospan was discharging a large amount of formaldehyde and that those discharges were 'affecting water treatment'" is not legally dispositive of the matter.[23]  (Doc. 1 at 18, ¶ 94). Additionally, Oxford's mention in its NPDES permit that Kronospan was a "Significant Industrial User" whose industrial processes involve the production of formaldehyde is not dispositive of the issue.  Second, the court is not satisfied that this issue was within the reasonable contemplation of ADEM when it issued the permit given the present circumstances.  Third, to be entitled to relief, Oxford would have to be in compliance with the full terms of its permit.  *See Southern Appalachian Mountain Stewards v. A&G Coal Corp.*, 758 F.3d 560, 568 (4th Cir. 2014) (stating the availability of the permit shield defense is predicated upon "permittee's full compliance with all applicable application requirements, any

---

[23]The court also notes that the complaint further states (1) in April 2008, the Oxford Plant "recognized it had 'high' levels of formaldehyde coming from Kronosapan that caused 'interference' or malfunction of the Plant causing the Plant to violate its Permit (doc. 1 at 14, ¶ 73); (2) in July 2011, ADEM determined that Kronospan "was discharging a large amount of formaldehyde into the Oxford Plant which 'was affecting water treatment'" (*id.* at ¶ 74); and (3) in response to August 2011 comments by Riverkeeper concerning a proposed consent decree, ADEM wrote, "Oxford has previously indicated that formaldehyde from Kronospan was interfering with the WWTP.  As indicated in the proposed Order, [ADEM] has requested Oxford to provide acceptable pollutant levels which would be protective of the WWTP" (*id.* at ¶ 75 (footnote omitted)).

additional informational requests made by the permit authority and any applicable

notification requirements") (citing EPA, Revised Policy Statement on Scope of

Discharge Authorization and Shield Associated with NPDES Permits at 2 (Apr. 11,

1995)).  This aspect of the defense is in dispute in this action, as well as the state

civil enforcement action.  Resolving the foregoing matters will likely require this

court to make factual determinations about whether the discharges were

"adequately disclosed," what was within the "reasonable contemplation" of ADEM

at the time of the issuance of the permit, and whether Oxford was otherwise in

compliance with its permit.  Accordingly, the court finds that the motion is due to

be denied at this juncture.[24]

---

[24]In its post-hearing brief, Riverkeeper notes that Oxford may have made "a veiled abstention
argument for dismissal at the hearing." (Doc. 31 at 26).  Riverkeeper asserts abstention is not
warranted under the circumstances. (*Id*.)  Oxford does not address this contention in its
subsequent, post-hearing brief. (Doc. 33).  The court deems any such argument waived under
the circumstances.  Even if that were not the case, the undersigned sees no abstention issues in
this matter.  *See Student Pub. Interest Research Group of New Jersey, Inc. v. P.P. Oil & Chem.
Storage, Inc*., 627 F. Supp. 1074, 1085 (D.N.J. 1986) (stating "Congress intended citizen suits to
supplement state governmental action.  One does not preclude the other under the scheme set up
under the FWPCA"); *Franklin v. Birmingham Hide & Tallow Com., Inc*., 1999 WL 35235824, *
12 (N.D. Ala. Apr. 22, 1999) (J. Buttram) (same).

   During the hearing on the motions, the court posited the possibility of staying this action
pending resolution of the state action.  It now declines to do so because of the determination that
the state action is not adequate to ensure compliance with the CWA concerning certain of the
purported violations alleged by Riverkeeper.  To the extent Oxford argues that a stay would
promote efficiency among the parties and reduce costs (doc. 33 at 15), the court believes that a
coordinated discovery process with the state action will achieve the same result.  Such will be
required in this action.

## IV.   OTHER MOTIONS

There are three other pending motions: (1) Riverkeeper's motion to strike one of Oxford's arguments in its reply brief (doc. 22); (2) Riverkeeper's motion to file an amended complaint (doc. 26); and (3) Oxford's motion for a protective order suspending the parties' obligation to conduct a discovery conference and commence discovery (doc. 18).

### A.   Riverkeeper's Motion to Strike One of Oxford's Arguments in Its Reply Brief (Doc. 22)

Riverkeeper requests in its motion to strike that the court disregard Oxford's argument that it adequately disclosed the formaldehyde matter to ADEM.  (*Id*. at 1).  Alternatively, Riverkeeper requests an opportunity to file a short reply.  Oxford responds that Rule 12(f) of the Federal Rules of Civil Procedure does not apply because a reply brief is not a pleading and because it was only responding to arguments raised in Riverkeeper's response to its motion to dismiss.  (R. 25).

Subsequent to the filing of this motion, the parties were afforded oral argument and an opportunity to file post-hearing briefs.  The relevant issues have been fully argued and addressed by the parties.  Premised on the court's determinations above, the court finds this motion to be moot.

### B.   Riverkeeper's Motion to File an Amended Complaint (Doc. 26)

Riverkeeper seeks to amend its complaint to add two violations for recent *E.*

*coli* and chlorine discharges, and to amend the civil penalty amount for certain violations based on recently amended regulations. (*Id*. at 1-3). The motion is opposed by Oxford because, it asserts, the allegations "already are at issue in the state court lawsuit" and the amendment would be futile. (Doc. 28).

The applicable standard is clear:

Leave to amend should be liberally granted when necessary in the interest of justice. FED. R. CIV. P. 15(a). "[U]nless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981). The U.S. Supreme Court has held that undue delay and futility are adequate bases for denying leave to amend.

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court.

*Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

*Burger King Corp. v. Weaver*, 169 F.3d 1310, 1319 (11th Cir. 1999). Because the court has found Riverkeeper's complaint adequate to overcome Oxford's motion to dismiss, the amendment should be and will be allowed.

### C.     Oxford's motion for a protective order

In this last motion for a protective order, Oxford requests that the court suspend the parties' obligation to conduct a discovery conference and commence discovery.  (Doc. 18).  In view of the foregoing, this motion is moot.

## V.     CONCLUSION

Premised on the foregoing, the court finds Oxford's motion to dismiss this action (doc. 6) is due to be granted in part and denied in part; Riverkeeper's motion to strike (doc. 22) is due to be denied; Riverkeeper's motion to amend the complaint (doc. 26) is due to be granted; and Oxford's motion for a protective order (doc. 18) is moot.  A separate order will be entered.

**DONE**, this the 16th day of June, 2017.

**JOHN E. OTT**
Chief United States Magistrate Judge